UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

FANCHEST, INC.,                                    Case No. 20-43932-jmm

                                    Debtor(s)         Chapter 11 (Sub-Chapter V)
---------------------------------------------------------------x

## DECLARATION OF ABBAS MANIAR

I, Abbas Maniar, hereby declare as follows:

1.      I am the managing member of Phoenix Capital Growth, LLC, a Texas limited liability company ("Lender"). I base the information contained herein upon my personal knowledge and the documents and information maintained by the Lender. I have over 10 years of experience with companies engaged in online sales and digital marketing.

**A.**      **Lender's Loan to Fanchest, Inc.**

2.      On or about July 16, 2018, the Lender made a loan to Fanchest, Inc. ("Debtor") in the original principal amount of $1,100,000.00 ("Loan") pursuant to the terms of a Facility Agreement, dated July 16, 2018, between Lender and the Debtor and other supporting loan documents ("Agreements"). A copy of the relevant Agreements is annexed as Exhibit A. The Lender serves as the Collateral Agent and Administrative Agent under the Agreements as well. The Debtor granted the Lender a first priority security interest in all of the Debtor's assets pursuant to a Security Agreement executed on that same day. The Lender's security interest was perfected by the filing of a UCC-1 Financing Statement. I have been told by my counsel that the Debtor does not dispute the fact that the Lender holds a first priority lien on all of its assets.

1

B. **The Debtor's Failed Attempt to Restructure in 2019**

3. The Debtor first defaulted under the Loan in July 2019. In the Fall of 2019, the Debtor undertook an attempt to restructure its business through a merger and acquistion with an entity called Proxima Partners ("Proxima"). Proxima was owned by James Waltz, Douglas Neiman, and Andrew Jacobson. When Proxima acquired its interest in the Debtor, the Debtor was still operating. It had a functioning website, online sales of merchandise, and an email customer list with more than 600,000 customers. However, the Debtor was forced to attempt to restructure its business because it operated at a loss throughout the year. The Debtor's opening bank balance on January 1, 2019, was $2,668,168.21. By November 1, 2019, the Debtor's bank balance had shrunk to $174,527.44. See copies of Debtor's bank statements for 2019 annexed hereto as Exhibit B.

4. In an effort to attempt to assist the Debtor in restructuring its business, the Lender entered into a forebearance agreement with Jeffrey Lin, Daniel Weinberg, the Debtor, and FC Merger Corp. As part of the restructuring, FC Merger was merged into the Debtor with the Debtor serving as the surrviving entity and a wholly-owned subsidiary of Proxima Advisors, Inc. James Waltz ("Waltz"), the Debtor's present Chief Executive Officer, executed the documents on behalf of FC Merger Corp. The Forebearance Agreement extended the date for payment of the Loan in full to April 30, 2020. The Debtor never fully complied with the terms of the Forebearance Agreement by, among other things, not complying with a number of the conditions precedent contained in the Forebearance Agreement.

C. **The Debtor Ceases All Business Operations and Its Internet Presence in 2020**

5. Proxima's acquisition of the Debtor did not solve its financial problems. On

December 31, 2019, the bank balance had shrunk to $92,524.81. By Janaury 31, 2020, the Debtor's bank balance was down to $3,300.48. See a copy of Debtor's bank statements from Janaury 2020 to November 2020 annexed as Exhibit C. The revenue or deposits for Janaury 2020 were approximately $30,000. In February 2020, the bank statements reflect $53,552 in deposits. However, those deposits included $34,000 from Waltz's company Helix Digital Inc. ("Helix"). From March 2020 through the present day, the Debtor has not conducted any sales of its inventory or generated any revenue.

6. Communications from Waltz with the Lender effectively ceased in February 2020. A number of parties connected with the Loan, and former management of the Debtor, began to receive repeated inquiries from creditors who could not reach Waltz or receive any type of response from the Debtor. At this time, I learned that the two investors that had participated in the acquisition of the Debtor with Waltz withdrew from the venture. In fact, they asked me for a release and informed me that they no longer had anything to do with the Debtor. This was a red flag for me, and a violation of the Forebearance Agreement, since the Lender had not agreed to lend to an entity owned and controlled solely by James Waltz.

7. One of the most damaging events to occur after Waltz took over the Debtor's management was the Debtor's loss of its internet presence and customer base. I was informed that because the Debtor did not pay its relatively modest Mailchimp bill -- Mailchip is a program that maintains the database of emails for internet customers -- the account was shut down and the customer list was lost. The website for www.fanchest.com was also shut down. It is extremely costly and time-consuming to build a successful internet presence and build a 600,000 online customer list. It takes a lot of time, money, and effort to generate internet sales in this

competitive market. Any suggestion that an online sales company with no online presence can simply restart its business is simply inaccurate.

8.      By March 2020, the Lender exercised its right under the defaulted Forebearance Agreement and and all of the Agreements and took control of the Debtor's account at Silicon Valley Bank. A copy of the Deposit Account Control Agreement executed by the Debtor is annexed as Exhibit D. At that time, the Lender had not received payements from the Debtor for two months and the Debtor had not provided the Lender with any of the reports required by the Agreements. It seemed to me that Waltz had completely abandoned the Debtor's business from February 2020 until May 2020 until he was able to secure a Payroll Protection Program Loan ("PPP Loan") from Cross River Bank.

9.      On May 1, 2020, the Debtor had an opening bank balance of $2,687.20. On May 31, 2020, $135,611.92 was deposited in the Silicon Valley Bank account controlled by the Lender. When I learned that the source of the funds was from the Paycheck Protection Program, I was shocked. Despite the fact that the Debtor did not have payroll of any significance in 2020, the proposed average monthly payroll the Debtor set forth in its application was $54,244.77 a month. Since the Debtor had no employees at this time, I could not understand how the Debtor intended to comply with the rules regarding foregiveness of this loan.

10.     Although the Lender had the right to seize the funds in the account when they were deposited, the Lender waited until October 1, 2020, to lawfully take possession of the funds in the account. The Lender notified the Debtor's creditors of its actions to exercise its rights to the collateral. We were fully within our rights under the Agreements and applicable law to take possession of the funds. We also had no indication that the Debtor had the financial ability to

restart its operations with the proceeds of the PPP Loan. Waltz had also informed the Lender that he intended to use the proceeds of the PPP Loan to pay himself a significant portion of the funds. We did not see how Waltz's plans for the loan proceeds benefitted the Lender or any of the other creditors of the Debtor.

**D.     The Emergence of Helix Digital Inc. and Waltz's Interference With the Lender's Attempt to Recover its Collateral**

11.     The Lender was informed, at all times, that all of the Debtor's inventory was stored in a facility owned and controlled by Fosdick Fulfillment Corp. that is located in Connecticut ("Fosdick Warehouse"). When the Lender contacted the Fosdick Warehouse to inform it that we intended to exercise our rights to retrieve and sell our collateral, Waltz informed the Fosdick Warehouse that Helix asserted a lien against the inventory and they could not be released to the Lender. We learned that Helix had filed a lien in the Spring of 2020 in the amount of approximately $1,600,00.00 against the Debtor. Since the Fosdick Warehouse refused to release the collateral becasue of Waltz's actions, Fosdick commenced an interpleader action in Connecticut state court. We were forced to retain Conecticut legal counsel to defend our first lien on the collateral; the court ruled in our favor. The court found that we were entitled to the release of the collateral but we were required to either pay the Fosdick Warehouse for their unpaid charges, in the amount of $110,000.00, or obtain a bond for $150,000 before taking the inventory. The Lender learned it couldn't obtain a bond without full payment of the $150,000. The Lender believed, and continues to believe, that the Fosdick claim is over-stated.

**E.     Waltz's Self-Dealing on Behalf of Helix and Breach of the Lender's Agreement**

12.     There is no question that any transfer of inventory from the the Fosdick

Warehouse to another location, without the Lender's knowledge or consent, was a clear violation of the Agreements. Moreover, the Debtor was precluded under the Agreements from incurring debt from another entity without the Lender's consent. The Debtor asserts in its Schedule D that Helix holds a $1,597,635.71 secured claim against the Debtor. The Debtor's bank statements do not reflect an infusion of cash by Helix that reflects that amount. And when the Debtor was restructured in November 2019, there was no disclosure of a debt from Helix or any other creditor for that amount of debt. The Debtor recently suggested in a document filed with the court that it would consider subordinating Helix's claim to the claim of all other creditors. But Waltz's relationship to Helix was not disclosed in any of the documents filed with the Court until the Lender raised this issue.

13. It was not until this bankruptcy filing that the Lender learned that there was inventory stored in Florida with Molly Fulfillment Center ("Molly Warehouse"). Until this week, we did not know if the inventory stored in Florida was transported from the Fosdick Warehouse or was purchased with another source of funds from another account that has not been disclosed to the Lender. However, my counsel informed me that Waltz testified at the meeting of creditors this week that the Debtor bought all of the inventory located in Florida on credit. Upon information and belief, the inventory was purchased for hundreds of thousands of dollars and was not sold. As a result, Waltz caused the Debtor to incur a significant amount of additional debt without the Lender's knowledge or consent in violation of the Agreements and put the Debtor in deeper debt that it can not pay.

14. After incurring this additional debt, Waltz further harmed the Debtor by failing to keep track of the inventory. The bankruptcy schedules filed with the court assert that the

inventory in Florida was lost after the Molly Warehouse sold the inventory for non-paymemt of its storage fees. However, the Sub-Chapter V Trustee learned, after making a few telephone calls, that the inventory was not sold and is still available. The Lender is very concerned that Waltz did not take the approriate steps to secure these estate assets and the Lender's collateral. The Lender is equally concerned about Waltz's decision to violate the terms of the Loan by entering into unauthorized borrowing without its knowledge or consent. The Lender does not believe that Waltz can act as the fiduciary for the creditors of the bankruptcy estate under these circumstances.

F. **The Debtor Has Not Established That It Can Repay the Lender for Any Funds Paid By The Lender on the Debtor's Behalf or It Has the Ability to Reorganize**

15. My legal counsel has informed me that the Debtor is requesting that the Court order the Lender to pay for the costs of the Debtor's desire to attempt re-start its business by requiring the Lender to pay the amount of the funds it seized from the Debtor's account. In fact, the Debtor has asserted to the Court that if it is provided these funds, it can recommence its business. I find this assertion incredible and, frankly, impossible to prove.

16. First, it is not disputed that the Lender has a lien on all of the assets of the Debtor and was fully entitled, under applicable law, to take possession of the funds in the Debtor's account. Once the Lender took title to the funds, the Debtor lost its interest in those funds. Cross River Bank has filed a proof of claim for its unsecured loan against the Debtor. The funds were nothing more than the proceeds of a loan that were deposited in the Debtor's account. The Debtor has no right to assert that it presently has an interest in these funds.

17. Second, when the merger occurred in November 2019, the Debtor still had

employees, a customer list, an internet presence, a website, and continuing sales. At that time, the Debtor --and Waltz -- had $178,000 on hand to "re-start" the business. There was no COVID-19 business shut-down at that time and nothing to preclude the Debtor from reorganizing its business. After March 2020, there was a cessation of retail sales, and a slow-down of internet sales, but there was nothing to prevent the Debtor from keeping its on-line busines afloat. In fact, a simple Google search will reveal that on-line sales of sporting goods increased for retailers such as Dick's Sporting Goods and www.fanatics.com, one of the largest on-line seller of sports apparel. See., e.g., annexed Industry Research Report predicitng that sporting goods sales rose during the COVID-19 pandemic as Exhibit E. It seems that Waltz just didn't want to, or didn't know how to, restart the business. I can not imagine how he can do so at this juncture with no employees, no customer list, no website, and with old inventory that has lost significant value.

18.    Third, I have been told by my counsel that the Debtor asserts that requiring the Lender to pay the costs listed in its Emergency Motion for the Use of Cash Collateral would result in a savings to the bankruptcy estate. I do not see how that is accurate. I have been informed that the PPP Loan program requires the Debtor to have spent 60% of the loan proceeds for payroll costs before December 31st. Obviously, that can not occur. As a result, I have been informed that all of the loan, or only a portion of the loan, can be forgivern under these circumstances.

19.    Fourth, I simply do not see how the Debtor has proven to the Court that it can repay the Lender for any money the Lender expends on the Debtor's behalf. As set forth in the emails annexed as Exhibit F, the Lender has been unable to locate a single buyer that is willing to inspect the goods or make an offer to purchase the goods. As set forth in Exhibit G, the Debtor

valued its inventory as having a retail value, in or about December 2019, of $2,508,627.00 but listed the cost of purchasing the inventory as $1,302,489. The Debtor informed me that some of the inventory is three years old. I genuinely suspect that, under the present circumstances, the Debtor can not recover more than a small percentage of what it paid for the goods. Since the Lender is owed close to $700,000, I believe the Lender is an under-secured creditor of the Debtor.

20. Fifth, I believe that the Debtor's proposed budget is wholly unrealistic and understated. The Debtor can not re-establish its business without a significant investment in internet marketing and advertising. Based upon the estimates obtained by the Lender, the costs to transport the inventory to a new and less expensive facility seem understated: the Court should require the Debtor to prove the estimated costs before accepting the Debtor's estimates. The Court should not grant the Debtor's request to provide the Lender with replacement liens without requiring the Debtor to prove the value of the collateral it is relying upon and without ensuring that the replacement liens have any value. The Court should simply deny the Debtor's request to compel the Lender to pay the Debtor funds it is not entitled to so that the Debtor can engage in a speculative attempt to reorganize a business that hasn't operated for close to a year.

21. Finally, my counsel informed me that Waltz testified during the Section 341 meeting of creditors this week that he was talking to investors that may infuse capital in the Debtor to help restart the business and that he should know if they will proceed in the next few weeks. When asked by the Sub-Chapter V Trustee what would happen if he could not obtain this capital infusion, Waltz testified that he intended to start selling the merchandise on-line on Amazon and it would take a few years to complete these sales. As I stated above, $135,000 is

wholly insufficient to re-start this business since Fosdick's charges and the costs of transporting the goods would consume a majority of the funds. Under these circumstances, the Lender opposes the Debtor's request in its entirety and strongly opposes any request that it be required to pay Waltz compensation for performing duties he has failed to perform since early 2020. The Debtor should be required to demonstrate a realistic exit strategy and the prospect of an actual operating business before the Court permits the Debtor to proceed any further.

      I declare the foregoing is accurate and true under the penalty of perjury.

Date:  Dec. 16, 2020
Houston, TX

                                                                                               */s/Abbas Maniar*_____
                                                                                               Abbas Maniar