OFFIT KURMAN, P.A.
Michael T. Conway, Esq.
590 Madison Avenue, Sixth Floor
New York, New York 10022
Telephone: (929) 476-0041
Facsimile: (212) 545-1656
Michael.Conway@OffitKurman.com

Counsel for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
_____

In re:                                                                    Case No: 20-43932-jmm

FANCHEST, INC.,                                                  Chapter 11

          Debtor.[1]
_____

# DECLARATION OF JAMES WALTZ IN SUPPORT OF AMENDED PLAN OF REORGANIZATION FOR SMALL BUSINESS UNDER CHAPTER 11

I, James Waltz, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:[2]

1. I am the President and Chief Executive Officer of Fanchest, Inc., a Delaware corporation ("Fanchest" or the "Debtor"). I am knowledgeable and familiar with the business and financial affairs of the Debtor as well as the following. I am above 18 years of age and I am competent to testify.

2. I submit this Declaration in support of the Debtor's Amended Plan of Reorganization for Small Business Under Chapter 11 (the "Motion").

3. Despite its current situation, Fanchest has become a recognized brand in sports merchandizing. This is why my company, Proxima Partners LLC ("Proxima") purchased the

---

[1] (Federal Tax Id. No. xx-xxx 3182).
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

Debtor in November 2019. As everyone experienced, the COVID-19 pandemic turned the sports world on its head, and this was the direct cause of the Debtor's current situation. Upon confirmation of the Plan, Fanchest expects utilize the Amazon Marketplace platform to sell its existing inventory. The Debtor also plans to engage post-confirmation with various businesses and charities on sports-related B2B fulfillment projects.

4. Current, the Debtor is in the process of redesigning its website, but an example of the Fanchest "signature product" is depicted in the website screenshot annexed hereto as Exhibit "A."

5. The Debtor submitted its Plan on February 26, 2021 [Dkt. No. 79]. I have read the Plan and am familiar with its terms. I believe the Plan is factually accurate. I incorporate the factual statements contained in the Plan herein.

6. The Plan contains five classes of claims in addition to Administrative Claims and Priority Tax Claims, which are not assigned to a particular class. The Debtor estimates that Administrative Claims will be approximately $100,000. There were Priority Tax Claims filed by the State of New York and the Internal Revenue Service. These claims amount to $12,576.80, however, on information and belief these claims are based on estimates of 202 revenue at the same level as Fanchest earned in 2019. In fact, Fanchest only made sales for a part of January 2020 and so this number should be much smaller once the claims are fully resolved. Regardless, as shown below, for the purpose of the Plan analysis, the Debtor will treat them as if the claim will be allowed as filed and estimates Administrative Claims and Priority Tax Claims at $112,576.80.

7. Next, in Class 1, the Debtor categorized allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)). No claims which fall into this category were filed.

8. Class 2 is the secured claim filed by Phoenix Growth Capital LLC ("Phoenix"). This claim was amended earlier this week to increase it to the amount of $738,956.00. Phoenix was the Debtor's senior secured lender pre-petition and its claim includes $414,259.00 representing principal and interest, and $324,697 in legal and administrative fees. While the principal and interest is higher than it should be, the real problem with this claim is the demand for $324,697 in legal and administrative fees. The Debtor has requested unredacted versions of the "proof" annexed to the claim, but as yet has not received anything from Phoenix to support this aspect of its claim. The Debtor expects to challenge the recoverability of this amount because, as set forth in the Plan, every dollar that this claim is reduced below $603,087.93 is a dollar that get applied to a dividend to the Unsecured Creditors in Class 4. In any event, for the purpose of a feasibility analysis, this claim will be treated as if it will be allowed at $738,956.00.

10. Class 3 is easier to deal with. This is the secured claim of Helix Digital Inc. ("Helix") in the amount of $1,597,635.71. As set forth in the Plan, Helix has agreed that if the Plan is confirmed its claim is subordinated to the claims of Unsecured Creditors in Class 4.

11. As indicated, Class 4 is made up of the Unsecured Creditors of Fanchest. The Debtor had *scheduled* unsecured claims of $1,850,775.01 and *filed* unsecured claims in the amount of $1,435,891.31. In the event the Phoenix claim is reduced below $603,087.93, a dividend will be paid to the Unsecured Creditors in an amount equal to the net remaining. This concept warrants further explanation. As set forth in Exhibit 2 of the Plan, the Debtor has calculated its projected disposable income (the "Projection") for purposes of a distribution to creditors by modeling a sale of the Debtor's Existing Inventory (inventory currently on hand) and selling it at retail utilizing the Amazon Marketplace where Debtor believes it can recovery the highest amount for this Current Inventory. The Projection is based on my experience in running successful scaled Amazon

Marketplace stores and I modeled the costs in the Projection according to actual costs from other operating stores in the Amazon Marketplace. I believe the Projection contains an accurate accounting of what the Debtor's income and expenses will look like during the three-year period following confirmation assuming a sale of the Current Inventory in this manner. As suggested in discussions with the subchapter V Trustee, the one variable here that might change the analysis is the Current Inventory Approximate Retail Value which we took from the book value - $2,508,647. Although it is likely that this number is indeed too high, we used it because it results in the highest possible recovery for the Unsecured Creditors. At the outset of this case, Phoenix argued to this Court that their potential vendor, Hilco, estimated a liquidation sale would result in approximately $100,000 for the Current Inventory. Later, Fanatics, Inc. suggested they would pay $450,000 for the Current Inventory.

12. Accordingly, the subchapter V Trustee suggested the liquidation analysis be amended to provide two scenarios – one at a "minimum" value of $485,000 and one at a "maximum" value of $1,455,000. In the analysis attached to the Plan, the Debtor showed Net Profit of $603,087.93 and Disposable Income of ($38,912.07) assuming the sale of all the Current Inventory over a three-year period following confirmation. This was also based on the original Phoenix proof of claim, then filed in an amount of $642,000.

13. The result of using the more conservative values suggested by the subchapter V Trustee for the Current Inventory result in a reduction of to the "Average Price per Retail Item" which, in turn, results in a reduced Net Profit over this three-year period of ($858,547.33) and Disposable Income of ($1,500,547.33), or ($180,071.31) and ($822,071.31), respectively. In either case, there is no Disposable Income for the Unsecured Creditors and this only gets worse when we factor in the approximately $100,000 in additional legal fees now being claimed by Phoenix in its

4

recent amended proof of claim. Notwithstanding the fact that seemingly everyone has dismissed the Approximate Retail Value of $2,508,647 as too high, the Debtor has committed under the Plan to use this number in calculating the amount which it will use in calculating a potential dividend to the Unsecured Creditors. To the extent that the Debtor has overestimated this Approximate Retail Value, it is an error which strengthens the argument that the Plan should be confirmed.

14. The Plan is simple: the estimated Net Profit over the next three years of $603,087.93 will be used to pay the claims in Class 2 and 4 (Phoenix and the Unsecured Creditors). The Administrative Claims and Priority Tax Claims will be paid through a separate fund made available to the Debtor by a sale of 80% of the existing equity to National NonProfit Corporation. In addition, because this fund is now seemingly insufficient to adequately "backstop" all of the expected payments to be made under the Plan, Helix has agreed to enter into a line of credit facility in the form annexed hereto as Exhibit "B" (the "Line of Credit"). More specifically, the Plan will require estimated payments toward Administrative Claims of $112,576.80 and a Phoenix claim in the amount of $738,956.00, for a total estimate of claims required to be paid under the Plan of $851,532.80. The Debtor is already receiving a cash infusion for payment of claims in the amount of $703,087.93. This leaves a potential shortfall of $148,444.87. Helix has agreed to extend a line of credit to Fanchest in the amount of $150,000.00, with draws being repaid over three years bearing interest at ten percent per annum. While we expect there will be no need to utilize this line of credit, it is there to make certain that all amounts due under the Plan can be paid when due. If the Phoenix claim is reduced below $603,087.93, the difference will be used to pay a dividend to the Unsecured Creditors.

15. Based on the above, I believe the Debtor has the ability to perform all of the provisions of the Plan.

16. Debtor's counsel has explained that any payment for professional services provided during the bankruptcy case must be approved by the Bankruptcy Court. Except as authorized by court order, I do not intend to pay any such expenses unless and until court approval is obtained.

17. As stated previously on the record in this case, I am the sole officer of the Debtor. While I intend to continue serving in this capacity, I expect to hire an Operations Manager to handle day to day operations and it is entirely possible that the new majority owner of the Debtor post-confirmation will replace me at some point. I have no prior connection to National NonProfit Corporation, no ownership in this entity or any entity related to National NonProfit Corporation, or any ownership in any entity owned by the principals of National NonProfit Corporation. I will continue to serve in my current capacity after confirmation of the Plan at their pleasure.

18. The Plan also contains a Liquidation Analysis, which in a liquidation scenario, projects that neither the Class 1 Priority nor Class 3 General Unsecured Creditors would be paid. I have reviewed the Liquidation Analysis and believe it accurately portrays what the Debtor's property might sell for in a liquidation scenario, but assuming that the Phoenix vendor, Hilco, is correct and the Current Inventory sold for approximately $100,000.00, there would be nothing left in a liquidation to pay anything other than Administrative Claims. Even under the Debtor's more aggressive liquidation analysis Phoenix would get less than a 100% payment as it will receive under the Plan, and no other creditors will receive a payment of any amount.

19. No government regulatory commission or agency is required to approve the Plan or terms of the Plan.

20. The Debtor does not owe child support or domestic support obligations.

21. The Debtor has no unpaid wage claims nor claims for commissions.

22. The Debtor does not owe claims for non-payment to any employee benefit plan.

23. The Debtor does not operate a grain storage facility.

24. The Debtor does not owe a debt to fishermen.

25. There are no claims made by any creditors for pre-petition deposits for purchase or lease of products for any creditor's personal family or household use.

26. The Debtor does not owe the Bankruptcy Court for any fees.

27. Debtor is not paying retiree benefits; therefore, no retiree benefits will be affected by the Plan.

28. As the Plan proponent, I attest that the Plan has been proposed in good faith and, to the best of my knowledge, not by any means forbidden by law.

Dated: April 8, 2021

                                                                                                                _____
                                                                                                                 James Waltz

Exhibit A

Free Exchanges & Returns



# UNIQUE SPORTS GIFTS
## ALL FANS WILL LOVE

DELIVERED RIGHT TO YOUR DOOR

SHOP BY LEAGUE

## SHOP OUR COLLECTIONS



SHOP NFL



SHOP NHL



SHOP COLLEGE



SHOP BABY





Exhibit B

**PROMISSORY NOTE**

$150,000                                                          April 9, 2021

For value received, the undersigned ("Maker") promises to pay to Helix Digital Inc. ("Payee"), at 4 Circle Drive, Rumson, NJ 07760, the principal sum of One Hundred Fifty Thousand, and 00/100 Dollars ($150,000), together with interest at the rate hereinafter provided on the unpaid principal balance of this note from time to time outstanding until paid in full. It is the intent of the Maker and Payee hereunder to create a line of credit agreement between Maker and Payee whereby Maker may borrow up to $150,000 from Payee, contingent on the entry of a non-appealable Order of Confirmation of a Plan of Reorganization propounded by Maker in the pending Bankruptcy cCase of Maker, Case Number: 20-43932-jmm.

Interest shall accrue on the unpaid and outstanding principal balance of this note commencing on the date hereof and continuing until repayment of this note in full at a rate per annum equal to 10.00%. Principal and interest payments shall be deferred until 60 days following the entry of a non-appealable Order of Confirmation of the United States Bankruptcy Court with jurisdiction over the bankruptcy of the Maker (the "Bankruptcy Court") of the Maker's pending Amended Plan of Reorganization for Small Business Under Chapter 11, then payments shall be made in equal monthly installments in an amount sufficient to fully amortize the amount of principal and any accrued interest due on the thirty-six month anniversary of the first payment due hereunder. Maker shall make all payments hereunder to Payee in lawful money of the United States and in immediately available funds. Should default be made in payment of any installment when due hereunder the whole sum of principal and interest shall become immediately due and payable at the option of the holder of this note.

Maker waives presentment, demand, notice of demand, protest, notice of protest or notice of nonpayment in connection with the delivery, acceptance, performance, default or enforcement of this note or of any document or instrument evidencing any security for payment of this note. Failure at any time to exercise any of the rights of Payee hereunder shall not constitute a waiver of such rights and shall not be a bar to exercise of any of such rights at a later date. In the event of commencement of suit to enforce payment of this note, the prevailing party shall be entitled to receive the costs of collection including reasonable attorneys' fees and court costs.

Nothing contained in this note shall be deemed to require the payment of interest or other charges by Maker or any other person in excess of the amount which the Payee may lawfully charge under the applicable usury laws. In the event that Payee shall collect moneys which are deemed to constitute interest which would increase the effective interest rate to a rate in excess of that permitted to be charged by applicable law, all such sums deemed to constitute interest in excess of the legal rate shall be credited against the principal balance of this note then outstanding, and any excess shall be returned to Maker. EACH OF MAKER AND PAYEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

IN WITNESS WHEREOF, the undersigned has caused this promissory note to be duly executed as of the date first written above.

FANCHEST, INC.

_____
James Waltz, CEO